JACKSON COUNTY PUBLIC
HOSPITAL, Appellee,

v.

PUBLIC EMPLOYMENT RELATIONS
BOARD, Appellant.

No. 62347.

Supreme Court of Iowa.

June 27, 1979.

Thomas J. Miller, Atty. Gen., Carlton G. Salmons, Asst. Atty. Gen., and N. Morrison Torrey and Nancy D. Powers, Public Employment Relations Board, Des Moines, for appellant.

Russell L. Samson and David H. Goldman of Rogers, Phillips & Swanger, Des Moines, for appellee.

ALLBEE, Justice.

This appeal has been brought by the Public Employment Relations Board to contest a district court decree which reversed the PERB's decision that it had jurisdiction over the food service workers at Jackson County Public Hospital. The hospital has cross-appealed, contending that the district court should have reversed the PERB for more reasons than it did. The substantive dispute in the case is whether the hospital was guilty of certain prohibited practices in the firing of two food service workers.

Jackson County Public Hospital is a health care facility which employs approximately 270 people. It is stipulated that the hospital is a public employer within the meaning of the Public Employment Relations Act, section 20.3(1), The Code. The hospital has, for a number of years, contracted with A.R.A. Services, Inc., for the provision of all food services on a cost-plus basis. A.R.A. is a Delaware corporation with its principal office in Philadelphia, Pennsylvania, and provides similar food services to various institutions over much of the country.

The circumstances out of which this controversy arises have their genesis in January of 1975. It was during that month that a representative of the Hotel and Restaurant Employees and Bartenders International Union AFL–CIO wrote to the local A.R.A. manager and demanded recognition of the union as the collective bargaining representative for food service workers. A representation petition was filed concurrently with that demand. The demand was made on the premise that the food service workers were employees of A.R.A. and were thus subject to the jurisdiction of the National Labor Relations Board.

A.R.A. did not accede to the union's demand and a hearing on the representation petition was necessary. In the decision on

that matter filed on April 2, 1975, the NLRB's Regional Director, acting on behalf of the NLRB, determined that A.R.A. was not engaged in commerce within the meaning of the NLRA, and that A.R.A.'s operations were intimately related to the patient care functions of the hospital, an institution which is exempt from NLRB jurisdiction. The representation petition was therefore dismissed.

The parties, particularly the hospital, attribute great importance to the precise reasons for the NLRB's action. We do not attach such weight to those reasons. We do note, however, that the decision appears to have merely assumed that A.R.A. was the employer of the food service workers, and made no specific findings on that issue.

In May 1975, food service employees met and determined to continue organizational efforts, this time under the Iowa Public Employment Relations Act, chapter 20, The Code. The hospital, through its administrator, Jon Jensen, made known its opposition to the unionization of food service workers.

On June 2, two food service workers who had participated in organizational activities, Phyllis Scott and Janice Edson, were called to the hospital administrator's office. There the administrator, with the food service manager in attendance, conducted what is referred to as the "termination interview." The two were informed that they were no longer suited for their positions as diet aides and were given their termination letters. Those letters were authored by the food service manager and cosigned by the hospital's administrator.

Finally, on August 26, 1975, the American Federation of State, County and Municipal Employees, AFL–CIO, acting on behalf of the discharged employees, filed the prohibited practice complaint which initiated this action. The complaint alleged that Scott and Edson were discharged for union activity and that the discharges violated sections 20.10(2)(a), (b) and (d). The hearing officer and the PERB found that prohibited practices, violations of sections 20.10(2)(a) and (d), had occurred. On judicial review, the district court agreed that the PERB could find such violations, but held that the PERB was without jurisdiction because the food service workers involved were not public employees. From this decision, both parties have appealed.

I. We are initially confronted by several procedural issues. Two of these have been raised by the parties, but the first has not.

A. The first question is whether the hospital's appeal to the district court was filed in a timely manner. Section 20.11 establishes the procedure for filing and acting upon a prohibited practice complaint. The final subsections of section 20.11, 20.11(5) through 20.11(11), purport to establish a means for obtaining judicial review of any PERB decision on a prohibited practice complaint. Section 20.11(5) provides that any appeal to the district court must be taken within ten days of the filing of the PERB decision or order appealed from. This provision is in conflict with the judicial review provisions of the Iowa Administrative Procedure Act, section 17A.19(3), The Code, which allow thirty days for the filing of a petition for judicial review. There are, of course, numerous other inconsistencies between the judicial review methodology provided by section 20.11(5)–(11) and that of sections 17A.19 and .20. It is, however, the appeal deadline which is most clearly of critical importance in this case because the hospital's petition for judicial review was filed on November 22, 1976, the twenty-sixth day after the PERB decision was filed on October 27.

■ It would appear that the legislature perceived a need for a more rapid disposition of questions arising out of labor-management disputes. See also §§ 20.13(3) and 20.14(6) (applying the section 20.11 hearing and appeal procedures to bargaining unit determinations and bargaining representative determinations). Section 17A.19 very clearly provides, however, that it is the exclusive means of obtaining judicial review of agency action, "[e]xcept as expressly provided otherwise by another statute referring to this chapter by name . . . ." There is no mention of the Iowa Administrative Procedure Act in section 20.11.

There is certainly no express provision that section 20.11 should be followed instead of section 17A.19. While we are troubled by this disparity in view of the fact that the PERA and the IAPA were both before the legislature at the same time, *see, e.g.,* 1974 H.J. 723 (At 1:20 p.m. on February 28, a special order of business for the consideration of House File 1200, the IAPA, was deferred to permit continued debate on Senate File 531, the PERA.), we are confronted by the clear language of section 17A.19. That language means what it says. *E.g., City of Davenport v. PERB,* 264 N.W.2d 307, 311 (Iowa 1978). Section 17A.19 governed the filing and course of judicial review in the district court. *See PERB v. Stohr,* 279 N.W.2d 286, 289 (Iowa 1979). The petition was timely filed.

■ B. The hospital contends that the district court erroneously limited itself, when considering whether the alleged prohibited practices had been shown, to a consideration of whether the PERB's finding was supported by substantial evidence in the record made before the agency when that record is viewed as a whole. *See* § 17A.19(8)(f). The argument is that the district court should have determined whether the PERB applied a preponderance of the evidence test to find the elements of each prohibited practice as provided by section 20.11(9). But section 20.11(9) purports to be a statement of standards for judicial review of PERB findings on prohibited practice complaints. And, as we have just explained, this case was governed in the district court by section 17A.19. The district court was therefore correct in applying the substantial evidence test of section 17A.19(8)(f). Of course, as also noted above, if section 20.11 did apply, the hospital would have no basis for complaint because its petition, under section 20.11(5), would have been filed sixteen days late.

C. Finally, the parties have raised a question regarding the scope of this court's review of a district court's decision on judicial review of agency action. The PERB states the issue as being whether this court's review under section 17A.20 is limited to determining whether the district court reasonably applied the proper legal standards of section 17A.19(8).

In *Hoffman v. Iowa Department of Transportation,* 257 N.W.2d 22, 25 (Iowa 1977), this court recited its task as being "to review the record in the manner specified in § 17A.19(7) and make anew the judicial determinations specified in § 17A.19(8)." This rule has been reiterated on several subsequent occasions. *See, e.g., Davenport Community School District v. Iowa Civil Rights Commission,* 277 N.W.2d 907, 909 (Iowa 1979); *Davoren v. Iowa Employment Security Commission,* 277 N.W.2d 602, 603–04 (Iowa 1979); *Taylor v. Department of Transportation,* 260 N.W.2d 521, 522 (Iowa 1978). The question does not appear to have been a serious issue in any of these cases.

Section 17A.20 provides:

> **Appeals.** An aggrieved or adversely affected party to the judicial review proceeding may obtain a review of any final judgment of the district court under this chapter by appeal to the supreme court. The appeal shall be taken as in other civil cases, although the appeal may be taken regardless of the amount involved.

■ In "other civil cases," this court sits to correct errors of law. Iowa R.App.P. 4. Thus, this court's duty, under the IAPA, is to correct errors of law made by the district court.

■ But the district court, when exercising the powers conferred on it by section 17A.19, is itself acting in an appellate capacity to correct the errors of law specified in section 17A.19(8). *Iowa Public Service Co. v. Iowa State Commerce Commission,* 263 N.W.2d 766, 768 (Iowa 1978). Thus, when this court reviews a decision of a district court rendered pursuant to section 17A.19, the sole question is whether the district court correctly applied the law. In order to make that determination, this court applies the standards of section 17A.19(8) to the agency action to determine whether this court's conclusions are the

same as those of the district court. If the conclusions are the same, affirmance is in order. If they are not, reversal may be required.

Having disposed of these preliminary matters, we now move to the merits of the parties' contentions.

II. The issue of whether the PERB has jurisdiction in this case may be broken into two questions. The first is whether the PERB is precluded from asserting jurisdiction by federal preemption of the labor law field. Because it is clear that the PERB is not so precluded, we must proceed to the second question, which is whether the PERA gives the PERB jurisdiction over the food service workers at Jackson County Public Hospital.

■ A. Analysis of the preemption question must begin with recognition of the rule that where an employee complains of employer conduct which constitutes an unfair labor practice under section 8(a) of the NLRA, 29 U.S.C.A. § 158(a), even though the allegation is not made in the form of an unfair labor practice complaint, the NLRB has exclusive jurisdiction. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The provisions of section 20.10(2)(a), (b) and (d), The Code, closely resemble the provisions of section 8(a)(1), (2) and (4) of the NLRA. Therefore, conduct which is violative of the first would also be violative of the second, but for the fact that the PERA applies only to public employees, a group specifically exempted from the NLRA. *See* § 2(2) of the NLRA, 29 U.S.C.A. § 152(2). The preemption question might thus be answered very simply by determining whether the involved employees are public employees as defined by federal law. Such an analysis cannot be applied to this case, however, because it would not adequately respond to the argument made by the hospital. We proceed, therefore, on the hospital's questionable assumption that the complaint here alleged unfair labor practices forbidden by the NLRA.

Briefly stated, the hospital's argument is this: The NLRB may decline to assert jur-

isdiction in any given case for either of two reasons. It may decline because it has no statutory jurisdiction, or it may decline on discretionary grounds. The hospital admits, as it must, that a declination based on the absence of statutory jurisdiction would foreclose preemption. It claims, however, that the NLRB representation case decision of April 1975 found that the NLRB had statutory jurisdiction but declined to assert that jurisdiction on a discretionary basis. Relying on *Guss v. Utah Labor Relations Board,* 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957), the hospital insists that intervention by a state agency is forbidden by the existence of statutory NLRB jurisdiction, in spite of an NLRB declination on discretionary grounds.

■ The basis of the NLRB's declination is of no moment, however, because the *Guss* rule upon which the hospital relies no longer has any vitality, having been supplanted in 1959 by an amendment to the NLRA. *Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 315–16, 91 S.Ct. 1909, 1932, 29 L.Ed.2d 473, 499–500 (1971) (White, J., dissenting). In that year, Congress added section 14(c)(2), 29 U.S.C.A. § 164(c)(2), which provides:

(2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State . . . , from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.

Section 14(c)(1), referred to in the quoted statute, is the provision which gives the NLRB authority to decline to assert jurisdiction on discretionary grounds. *See also National Transportation Service, Inc.,* 240 N.L.R.B. No. 64, 100 L.R.R.M. 1263, 1264 (1979). Assuming that the NLRB representation decision declined jurisdiction solely on discretionary grounds, section 14(c)(2) expressly permits action by the PERB.

■ This does not entirely dispose of the hospital's preemption contention, however, because the hospital also argues that a

NLRB declination of jurisdiction in a representation case does not necessarily indicate that the NLRB will decline jurisdiction in an unfair labor practice case. Thus, the hospital contends, the facts alleged still "reasonably bring the controversy within . . . the NLRA" and the state agency must decline jurisdiction in deference to the NLRB. *See Walles v. International Brotherhood of Electrical Workers,* 252 N.W.2d 701, 708 (Iowa 1977).

The cases which the hospital cites for the proposition that a declination in a representation case does not necessarily presage a declination in an unfair labor practice case involving the same parties do not support such a rule. They instead stand for the different proposition that, under some circumstances, even employees who may not have the right to organize into unions still have the right to be free of unfair labor practices.

In fact, there is no difference in the standards used by the NLRB to exercise its jurisdictional discretion in representation cases and in unfair labor practice cases. *See* § 14(c)(1) of the NLRA, 29 U.S.C.A. § 164(c)(1); *The Developing Labor Law* 775–81 (C. Morris 1971). *Compare, e. g., Dominick's Finer Foods, Inc.,* 156 N.L.R.B. 14, 60 L.R.R.M. 1565 (1965), *enforcement denied on other grounds,* 367 F.2d 781 (7th Cir. 1965) (section 8(a)(3) unfair labor practice case) *with, e. g., Carolina Supplies & Cement Co.,* 122 N.L.R.B. 88, 43 L.R.R.M. 1062 (1958) (section 9(c) representation petition case).

The hospital's preemption claim is without merit. But a finding that PERB is not precluded from exercising jurisdiction by federal law does not end the matter. It still remains to be determined whether Iowa law, the PERA, has given the PERB jurisdiction over these employees.

B. The question of whether the PERB has been given jurisdiction in this case must be answered by reference to section 20.3(3), The Code, which defines "public employee." The section provides: " '*Public Employee*' means any individual employed by a public employer, except individuals exempted un-

der the provisions of section 20.4." As previously noted, the parties agree that the hospital is a public employer; no claim is made that the food service workers are exempted under section 20.4. Therefore, our inquiry must focus on the meaning of the phrase "employed by," a phrase which is not defined in the Code.

The factors which establish an employment relation have been the subject of a good deal of development in the common law. It is therefore appropriate, in the absence of statutory definition, to make use of that body of common law in the present task. *State ex rel. Turner v. Drake,* 242 N.W.2d 707, 709 (Iowa 1976); § 4.1(2), The Code.

This conclusion is reinforced by the history of the definition of "employee" under the NLRA in the federal courts. Initially, in *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 124, 64 S.Ct. 851, 957, 88 L.Ed. 1170, 1181 (1944), the Supreme Court held that the definition of "employee" must be drawn "primarily from the history, terms and purposes of the legislation."

The following excerpt from H.R.Rep.No. 245, 80th Cong., 1st Sess. at 18 (1947) summarized the reactions of Congress, which overruled *Hearst* and its test by amending section 2(3) of the NLRA, 29 U.S.C.A. § 152(3).

An "employee," according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case of *National Labor Relations Board v. Hearst Publications, Inc.,* (322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), the Board expanded the definition of the term "employee" beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic "expertness" of the Board, upheld the Board. In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be "employees".

The people the merchants hired to sell the papers were "employees" of the merchants, but holding the merchants to be "employees" of the publisher of the papers was most far reaching. *It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up.* In the law, there always has been a difference and a big difference, between "employees" and "independent contractors". "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not far-fetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes "independent contractors" from the definition of "employee." (Emphasis added.)

The Court subsequently held, relying in part upon this excerpt, that the NLRB and the courts were to apply general agency principles in determining the existence of an employment relation. *NLRB v. United Insurance Co.,* 390 U.S. 254, 256, 88 S.Ct. 988, 989–90, 19 L.Ed.2d 1083, 1086 (1968).

■ Apart from the reasoning just set out, however, adoption of the common law agency tests will have two additional benefits. First, the PERB and Iowa courts will have the benefit of a substantial body of case law from the NLRB and federal courts applying those tests to possibly analogous labor situations. And, second, the question of federal preemption could be simplified in many cases because the PERB and the NLRB would both be using the same test for determining employment. Thus, a finding by one board that a particular group of employees is or is not employed by a public employer might well settle the matter in both forums. *See Board of Supervisors v. Chicago and North Western Transportation Co.,* 260 N.W.2d 813, 815 (Iowa 1977); Note, *The Preclusive Effect of State Agency Findings in Federal Agency Proceedings,* 64 Iowa L.Rev. 339 (1979). And as noted above, under the definition of "employer" in section 2(2) of the NLRA, 29 U.S.C.A. § 152(2), a finding of public employment would invoke an exception from the NLRA. We therefore hold that the existence of an employment relation under the PERA is to be determined by reference to general agency principles.

We now turn to the circumstances before us. In his proposed decision the PERB hearing officer made detailed findings of fact regarding the relationship of the hospital to the food service workers. Because those findings present an accurate picture of the record, we set out portions of them here.

[F]or the past 12 years the Hospital and A.R.A. Services, Inc., (hereinafter referred to as A.R.A.) have contracted for A.R.A. to direct the Hospital's food service operation. . . . A.R.A. is . . . paid $200 per week plus a dollar-for-dollar reimbursement for all expenses incurred necessary to the food service operation. The Hospital receives monthly itemized billings for all expenses; . . . . The Hospital, in return, receives the services of a managing dietician who performs the dual functions of supervising the approximately 27 food service employees, . . . , and is the Hospital's chief dietician.

The primary function of food service is to provide meals to patients as part of the Hospital's overall patient care, as well as to Hospital medical staff, other employees and patient visitors. Food service is included in the Hospital's organizational

chart as a department of the Hospital . . . , and is considered by Mr. Jensen [, the hospital administrator,] as an integral part of the Hospital's operation. All department employees are accountable to the administrator and to their respective department heads; the managing dietician [is the head of] the food service department.

The Hospital exercises close day-to-day supervision over the food service department. Mr. Jensen testified that he has requested that particular food service employees not be scheduled to serve at certain functions, . . . , has discussed with the managing dietician patient complaints concerning the quality of food or method of delivery, and has scheduled the use of both food service facilities and employees without conferring with the managing dietician.

The Hospital possesses complete control over all departmental staffing. Through intra-departmental management studies, . . . , the Hospital ascertains proper department staff levels. . . . [A] December, 1974, study of the food service department concluded the department was over-staffed and it was determined, between the [hospital] administrator and the food service manager, that the proper staff level would be achieved through attrition. Thus, any departmental staff increase or decrease must receive Hospital approval.

All capital equipment used in the food service department is owned by the Hospital. The Hospital provides all pest extermination, trash removal and utilities necessary and incidental to the preparation and delivery of meals. All major menu changes are submitted to the Hospital for approval. The hours of operation of the food service department and the cafeteria and prices for cafeteria and patient meals, are determined by the Hospital with the Hospital retaining all income from the food service operation. The Hospital additionally performs an annual audit of all food service accounts and conducts regularly scheduled inspections of the department, . . . , and requires the managing dietician to correct any deficiencies.

Food service employees are paid weekly by checks issued through A.R.A.'s Philadelphia office, use time sheets on which each employee records his or her time worked and are not covered by the Iowa Public Employees Retirement System (IPERS). Other Hospital employees are paid bi-weekly, use a time clock and are covered by IPERS.

. . . The Hospital provides food service employees with uniforms and requires them to observe Hospital policies concerning employee parking, lockers, dress code, and physical examinations. Further, employees of the food service department attend departmental meetings with the administrator at which various Hospital and intra-departmental concerns are discussed.

The Hospital determines employee fringe benefits. . . . [A] change in group insurance coverage for food service employees was achieved only after Hospital approval. . . . [F]ood service personnel are transferred to other Hospital departments without loss in accrued seniority, fringe benefits, or salary.

The managing dietician of the food service department has the authority, as do other department heads, to purchase items necessary for the department's operation directly from individual vendors or through the Hospital's purchasing agent. The managing dietician additionally, attends weekly staff meetings, participates in Hospital in-service training programs and is a member of several Hospital committees, for example, the counter-infection control committee. . . . [T]he managing dietician, as a department head, is required to accede to all procedures set forth in the Hospital's Personnel Manual, for example, the department head being an operative step in the Hospital's grievance procedure, and that any exception to those procedures must receive Hospital approval.

All department heads have the authority to hire, promote and discipline employ-

ees within their respective departments. The Hospital administrator, however, performs an active role in the hiring process. . . . [O]n at least four occasions Mr. Jensen recommended certain job applicants to the managing dietician. Those individuals were subsequently hired.

Department heads have the authority to discharge an employee without prior approval. Nevertheless, Mr. Jensen testified that the department head would inform him of the decision to discharge [and of] the reasons for the termination and [that] it is customary for the administrator and the department head to conduct a termination interview with the employee being discharged. This procedure was followed in Phyllis Scott and Janice Edson's discharge. Additionally, Scott and Edson's termination letters reflect the food service department's adherence to the Hospital's official termination policy. The letters stated, *inter alia* :

"*It is felt by the administration of the Hospital* that this employee does not fully meet the requirements for the position of diet aide *and should therefore be terminated from employment in the Hospital.*

Her vacation and two weeks severance pay in lieu of two weeks notice will be forthcoming *in compliance with Hospital procedures.*" (emphasis added [by hearing officer]).

Finally, . . . although department heads have the power to grant wage increases to employees within their respective departments, the Hospital board of trustees approves and sets the salary schedule and grants cost-of-living increases to all department personnel. Food service salaries, therefore, *conform* to those established by the Hospital. (Footnotes omitted.)

From these findings the hearing officer concluded that the hospital controlled the operation, personnel management and conditions of employment of the food services and that it was therefore the employer. On administrative appeal, the PERB agreed that the hospital exercised "significant, indeed predominant, control," but held that it could not ignore the role that A.R.A. played. Because A.R.A. performed a substantial amount of the initial hiring of food service employees, handled their personnel records and issued their pay checks, the PERB felt constrained to find "joint employment." While conceding that it did not have jurisdiction over A.R.A., the PERB concluded that the hospital had sufficient control over the food service workers to justify an exercise of the PERB's jurisdiction.

If the decision of the hearing officer were being reviewed, it is clear that his findings of fact would meet the standard of section 17A.19(8)(f) and that his conclusion that an employment relation existed between the hospital and the food workers would also survive scrutiny. *See, e.g., NLRB v. Deaton, Inc.,* 502 F.2d 1221, 1223–24 (5th Cir. 1974) (criteria for finding employment relations include, among other things, control, the parties' contractual declarations, provision of fringe benefits and the entrepreneurial character of the arrangement); *Restatement (Second) of Agency* § 220 (1958); *id.* Comment d (specifying control *or right* to control).

The district court, however, under section 17A.19, was to review the final agency action. The final agency action in this case was the decision rendered by the PERB on appeal from the hearing officer's proposal. *See* § 17A.15(3). The district court was to review and consider the consequences of the PERB's finding of "joint employment." And, under section 17A.19(8)(f), the district *court's conclusion that the PERB's finding* is adequately supported by the record was correct. Therefore, the only question which remains is what effect should be given to the PERB's "joint employment" finding. Was the PERB's assumption of jurisdiction after a finding of "joint employment" in excess of its statutory authority? *See* § 17A.19(8)(b).

█ "Joint employment" is a labor law concept which often finds application in bargaining unit determinations. *See, e.g., Boire v. Greyhound Corp.,* 376 U.S. 473, 84

S.Ct. 894, 11 L.Ed.2d 849 (1964); *S. S. Kresge Co. v. NLRB,* 416 F.2d 1225 (6th Cir. 1969); *Gallenkamp Stores Co. v. NLRB,* 402 F.2d 525, 528–32 (9th Cir. 1968); *County of Ulster v. CSEA Unit of the Ulster County Sheriff's Department,* 37 A.D.2d 437, 326 N.Y.S.2d 706 (1971). It applies to situations in which each of two employers has such significant control over the essential elements of labor relations with a group of workers that collective bargaining which did not involve both employers would be ineffective. *S. S. Kresge,* 416 F.2d at 1230. In the usual case both employers would be subject to the jurisdiction of the appropriate labor board.

This is not the usual case, however. Here the hospital is a public employer, subject to the PERA but exempt from the NLRA, while A.R.A. is a private employer, subject to the NLRA and exempt from the PERA. Our attention has been directed to two cases in which the NLRB was forced to deal with a joint employment situation involving one exempt employer: *Herbert Harvey, Inc. v. NLRB,* 137 U.S.App.D.C. 282, 424 F.2d 770 (1969), and *Ohio Inns, Inc.,* 205 N.L.R.B. 528, 84 L.R.R.M. 1005 (1973).

In *Herbert Harvey,* which the PERB relied upon to find jurisdiction, the court of appeals enforced an NLRB bargaining order directed to a corporation which provided janitorial services for the World Bank. The bank was exempt from NLRB jurisdiction and, on an earlier appeal, the court of appeals had held that the bank and Herbert Harvey were joint employers. The order to bargain and the decision enforcing it were based on the finding that Herbert Harvey had sufficient authority over wages, hours and other conditions of employment to be capable of effective bargaining. 137 U.S. App.D.C. at 287, 424 F.2d at 775.

*Herbert Harvey,* however, involves a contradiction in terms. The finding of "joint employment" directly contradicts any finding that one employer has sufficient control over the employment relation to effectively bargain on a solo basis. If the situation is truly one of "joint employment," NLRB, or PERB, jurisdiction over only one of the two employers is inadequate.

In *Ohio Inns, Inc.,* 205 N.L.R.B. 528, 84 L.R.R.M. 1005 (1973), the NLRB recognized that jurisdiction over only one of a pair of joint employers was inadequate. In that case, Ohio Inns, Inc., contracted with the State of Ohio to operate a lodge in a state park. The NLRB found that the State had retained such extensive control of the labor relations that it was at least a joint employer of the employees of Ohio Inns. Because the State was exempt from NLRB jurisdiction under section 2(2) of the NLRA, 29 U.S.C.A. § 152(2), the NLRB refused to assert jurisdiction.

 We find the rationale of *Ohio Inns* to be the more compelling. We reject the PERB's adoption of *Herbert Harvey* because it is internally inconsistent to find joint employment, which means that both employers must participate in the bargaining for meaningful negotiations to occur, and then hold in the same case that one of the two employers has sufficient control to engage, by itself, in effective negotiations. We therefore hold that the PERA does not authorize the PERB to assert jurisdiction in a joint employment situation where one of the joint employers is not a public employer. Power to govern only one of two necessary employers is insufficient for the PERB to perform its regulatory function. The district court was correct in concluding that the PERB exceeded its statutory authority, *see* section 17A.19(8)(b), in assuming jurisdiction over this dispute.

Our disposition of the jurisdictional issue makes consideration of the prohibited practice claim unnecessary.

AFFIRMED.

All Justices concur except HARRIS, UHLENHOPP, McCORMICK, and LARSON, JJ., who dissent.

HARRIS, Justice (dissenting).

I. In division I, discussing our scope of review, the majority recites with apparent approval *Hoffman v. Iowa Dept. of Transp.,* 257 N.W.2d 22, 25 (Iowa 1977). But the majority then applies what appears to be a

different scope of review. I would again make it clear that, when an appeal is taken to us under section 17A.20, we give no special deference to the district court's review of agency action. And we always review a district court's determination of law, not for reasonableness, but for accuracy. *Kurtenbach v. TeKippe,* 260 N.W.2d 53, 54–55 (Iowa 1977).

II. I cannot agree that the district court was right in holding PERB was without jurisdiction. It seems clear that the N.L. R.B. does not claim coverage under the national act if the operations of a private employee are intertwined with and subject to the control of exempt governmental subdivisions. *J–CE Co.,* 205 N.L.R.B. 578, 84 L.R.R.M. 1215 (1973); *Sis-Q Flying Service, Inc.,* 197 N.L.R.B. 195, 80 L.L.R.M. 1315 (1972). Once joint employment is found to exist, the question becomes whether the public employer's control over employment is such that the provisions of the statute can be efficaciously applied. *Compton v. Nat. Maritime U. of America,* 533 F.2d 1270 (1 Cir. 1976). I agree with the majority that the hospital did have sufficient control over employment under this test. The dispute was not pre-empted by the N.L.R.B.

I disagree with the majority's conclusion that PERB's assumption of jurisdiction, after finding joint employment, exceeded its authority. I do not find this question, as does the majority, to be one of law.

The majority cites two cases in the belief they stand for alternative holdings on the question: *Herbert Harvey, Inc. v. N. L. R. B.,* 137 U.S.App.D.C. 282, 424 F.2d 770 (1969) and *Ohio Inns, Inc.,* 205 N.L.R.B. 528, 84 L.R.R.M. 1005 (1973). I believe that both of these cases explored the question of whether the public employer's control over employment was such that the statute could be efficaciously applied. These were questions not of law but of fact. The differing facts of those cases resulted in opposite conclusions. We are not free to choose between those opposite factual conclusions in the belief they present alternative theories of law.

I believe there was substantial evidence to support PERB's determination as to the hospital's control over its employees. Accordingly, I think PERB can assert jurisdiction over the hospital.

On the whole record, I believe the finding of prohibitive practices by PERB was supported by substantial evidence. I would affirm.

UHLENHOPP, McCORMICK, and LARSON, JJ., join in this dissent.