Stuart **BUDDING**, Petitioner-Appellee,

v.

**IOWA DEPARTMENT OF JOB SERVICE**, Respondent-Appellant.

No. 2-68420.

Court of Appeals of Iowa.

May 31, 1983.

As Corrected Sept. 6, 1983.

Martin Ozga and Kathleen E. Keest, Des Moines, for petitioner-appellee.

Walter F. Maley and Joseph L. Bervid, Des Moines, for respondent-appellant.

Heard by OXBERGER, C.J., and DONIELSON, SNELL, SCHLEGEL, and HAYDEN, JJ.

OXBERGER, Chief Judge.

Respondent-agency and intervenor-employer appeal from the district court decision on judicial review reversing the agency's disqualification of petitioner from receipt of unemployment benefits. We affirm.

Petitioner, a tape cutter at a factory, was terminated after receiving three class two warnings within a twenty-six-month period. The first class-two warning was for excessive sharpening of a tape knife. The second class-two warning was for allegedly unsafe operation of a bicycle that petitioner had used to transport himself to another area of the plant. The third class-two warning was for alleged insubordination on company premises. Under the company's rules, an employee can be discharged if he receives two or more class-two warnings within a twenty-four-month period.

Petitioner's conduct resulting in the third class-two warning is basically undisputed. Toward the end of his shift, petitioner engaged in a little horseplay, pretending to trip near a pallet of exposed glass while passing his supervisor. Had he actually tripped, he could have fallen into cut glass and injured himself. Following this, petitioner took his coat out of his locker. His supervisor reprimanded him for doing this, and told him to leave his coat in the locker until the shift ended "from now on." Petitioner laid his coat on the table and started back to work. The bell signaling the end of the shift rang moments later. While he was leaving, petitioner referred to his supervisor as a "dirty bitch." He was fired.

Respondent-agency disqualified petitioner from receipt of benefits on the ground that he was guilty of misconduct and terminated for that reason. On judicial review the district court reversed. It held that the evidence did not support the conclusion that petitioner's acts constituted misconduct. Upon the motion of intervenor employer, that decision was vacated, but was incorporated in the district court's subsequent ruling which also stated that the use of vulgarity is not, in itself, sufficient to constitute misconduct. Respondent and intervenor appeal that ruling.

I. Scope of Review

 Our scope of review in cases arising out of the Iowa Administrative Procedure Act is limited under Iowa Code § 17A.20 to the correction of errors in law.

*Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 165 (Iowa 1982). The review function of the district court under § 17A.19 is to correct errors of law which are specified in 17A.19(8). When we review decisions of the district court which were rendered in its capacity as an appellate body under § 17A.19, the issue for our determination is whether the district court correctly applied the law. "In order to make that determination, this court applies the standards of section 17A.19(8) to the agency action to determine whether this court's conclusions are the same as those of the district court." *Jackson County Public Hospital v. Public Employment Relations Board,* 280 N.W.2d 426, 429–30 (Iowa 1979).

 Where the facts are disputed, we will adopt the factual determinations made by the Department as long as they are supported by substantial evidence in the whole record. *Temple v. Vermeer Mfg. Co.,* 285 N.W.2d 157, 160 (Iowa 1979). We do not make an independent determination concerning the preponderance of the evidence. *Reisner v. Board of Trustees of the Fire Retirement System,* 203 N.W.2d 812, 815 (Iowa 1973).

II. Misconduct

Iowa Code § 96.5(2) provides that a claimant is disqualified from unemployment benefits "[i]f the department finds that the individual has been discharged for misconduct in connection with the individual's employment." The sole issue before us is whether the department erred in holding that petitioner's conduct constituted misconduct as that term is contemplated under § 96.5(2). We note at the outset that we do not question the employer's right to terminate petitioner's employment. The issue we address relates solely to whether or not petitioner is entitled to unemployment compensation.

Misconduct is defined by 370 IAC 4.32(1) as:

A deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment.

Misconduct as the term is used in the disqualification provision as being limited to conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees, or in carelessness or negligence of such degree of recurrence as to manifest equalculpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed misconduct within the meaning of the statute.

■ As the definition suggests, in order to support a disqualification from unemployment benefits, the misconduct must be substantial. Misconduct serious enough to warrant the discharge of an employee is not necessarily serious enough to warrant a denial of benefits. In *Johnson v. Department of Employment Security*, 138 Vt. 554, 420 A.2d 106 (1980), an employee was fired for mishandling materials, refusing to perform certain tasks and arguing with his foreman. In ruling that the employee was not disqualified from benefits, the court stated that "[t]he employer has proved that the employee was balky and argumentative, but not that he harbored a willful disregard of the employer's interests." *Id.* 420 A.2d at 107.

### A. Vulgarity as the Basis of Misconduct

The jurisdictions are split on the issue of when the use of vulgar and abusive language constitutes misconduct of sufficient severity to warrant denial of unemployment benefits. The Commonwealth Court of Pennsylvania has held that where the use of vulgarity is "unjustified, unprovoked, unnecessary and uncalled for ... [it constitutes] willful misconduct justifying a denial

of benefits." *Fields v. Unemployment Compensation Board of Review,* 7 Pa. Cmwlth. 200, 300 A.2d 310, 311 (1973). The California Court of Appeals has held that a single hotheaded incident "falls within the category of a mere mistake or error in judgment ... and is not misconduct." *Silva v. Nelson,* 31 Cal.App.3d 136, 106 Cal. Rptr. 908, 911 (1973). The issue has yet to be addressed in this jurisdiction.

■ We agree that in some circumstances the use of vulgarity and abusive language can amount to misconduct. For example, the administration of a nursing home has the right to demand that nursing personnel not direct vulgar and abusive language towards patients, and a breach of this rule would constitute misconduct. *See Idecker v. LaCrescent Nursing Center, Inc.,* 296 Minn. 240, 207 N.W.2d 713 (1973). Similarly, a church group operating a day care center has a right to demand decorous language from day care center employees. *See Dodson v. Commonwealth, Unemployment Compensation Board of Review,* 63 Pa.Cmwlth. 245, 437 A.2d 1080 (1981). Even in a factory setting, where decorous language does not always prevail, repeated incidents of abusive language directed at a supervisor may amount to misconduct. However, it is unreasonable to expect employees to be entirely docile and well mannered at all times. *Avery v. B & Rental Toilets,* 97 Idaho 611, 549 P.2d 270 (Idaho 1976). Where the use of vulgar language is an isolated incident in an environment where decorous language is not required, and is not occasioned by a deliberate refusal to obey a reasonable directive, we are inclined to view it as a minor peccadillo. This is in accord with our oft-stated position that Code provisions which operate to work a forfeiture of benefits are strictly construed in favor of the claimant.

■ In the present case, petitioner blew off a little steam and referred to his supervisor as a "dirty bitch." Apparently he was upset after having been given what he considered to be an unfair reprimand. While we do not condone such behavior, we cannot say that it evinced a "willful or wanton

disregard" of his employer's interests. Petitioner did not refuse to obey any directives given to him by his supervisor. His admittedly caustic comment was not made in the course of an argument with her, and did not serve to undermine her authority. It was an isolated incident of relatively minor import.

### B. Cumulative Acts as the Basis of Misconduct

■ 370 I.A.C. 4.32(8) provides that "past acts and warnings can be used to determine the magnitude of a current act of misconduct." This provision has been referred to as the "last straw doctrine," since a relatively minor infraction, when viewed in the light of prior infractions, may evidence sufficient disregard for the employer's interests to constitute misconduct. The fact that the prior acts were remote in time from the one for which the employee was discharged, or different in nature, does not preclude a finding of misconduct. *Giddens v. Appeal Board of Michigan Employment Security Commission,* 4 Mich.App. 526, 145 N.W.2d 294, 298 (1966). However, this course of conduct must be sufficient to manifest an intentional and substantial disregard for the employer's interests.

■ Petitioner was discharged for receiving three class-two warnings in a twenty-six-month period. The first class-two warning was for excessive sharpening of a tape knife. Apparently the knife sharpening was assigned to the lead man. However, petitioner testified that the lead man was not there to do it on this occasion, and his supervisor testified that if the lead man is off the line, the tape cutters sharpen their own blades. The second class-two warning was for unsafe operation of a bicycle. The third class-two warning was discussed in the previous section.

We agree with the district court's conclusion that "[n]one of the actions for which [petitioner] was cited rise to a level of willful conduct directed against the interests of the employer, nor does a combination of those incidents constitute a material breach of the duties and obligations arising out of said employment." We do not dispute respondent's contention that petitioner's conduct was unsatisfactory. We merely point out that misconduct which will deprive an employee of unemployment benefits must be more than just unsatisfactory conduct. Accordingly, we affirm the decision of the district court.

AFFIRMED.

All Judges concur except DONIELSON, J., who dissents.

SNELL, J., joins the dissent.

DONIELSON, Judge, dissenting.

I respectfully dissent.

I accept the proposition that, to ban a claimant from receiving unemployment benefits, there must be shown some larger, more offensive act of misconduct than that required to justify termination of his employment. However, I believe the claimant's acts in the instant case rise to this level of misconduct and I would, therefore, deny him benefits.

The claimant's entire work record, and not just the specific incident which precipitated claimant's discharge, must be examined in order to determine whether he should be denied benefits due to his misconduct. In the instant case claimant was reprimanded and warned for misconduct many times.

The first time claimant was reprimanded for oversharpening the cutting knives. If the knives are too sharp there is a possibility that the pane of glass will be weak and may shatter when the wind pressure is great. In another incident claimant violated company rules by speeding through a hallway on a bicycle, almost running into and injuring the plant manager. The Rolscreen Company could have discharged claimant after this second incident but chose to give him yet another chance to improve his work habits. He failed to do so.

In yet another incident claimant pretended to stumble and almost fall into a large plate of glass in front of his supervisor.

Regardless of the "prankster" nature of this demonstration, it was a childish and dangerous stunt; claimant or anyone else nearby could have been severely hurt if claimant had fallen into and shattered the glass. After he was reprimanded by his supervisor, he went to the closet and removed his coat. This was ten minutes before the end of the work shift and the employees had been previously warned not to remove their coats until the shift ended. He was thus reprimanded again for violating the company rule regarding the work shift schedule. When the shift then ended at 4:00, claimant passed the supervisor and called her a "dirty bitch" in front of other employees.

Considering all of these acts together, I can reach no other conclusion but that claimant was a show-off and a troublemaker. His willful violation of the company rules not only demonstrated a disregard of standards of behavior which the employer has a right to expect of employees, but also jeopardized the safety of himself and other employees. With this fact clearly evidenced in the record, I believe there was substantial support in the record for upholding the hearing officer's findings and conclusions.

I feel it necessary to clarify one additional point of my differentiation with the majority. While I would not focus on the isolated incident of name-calling, I believe this, too, demonstrates a disregard of the standards of behavior which an employer has the right to expect from employees. The fact that there is a factory setting where offensive language may be used with some frequency, does not mean that the employer should allow the same words to be used in a serious name-calling situation or confrontation. An employer has the right to expect decency and civility in the treatment of others, regardless of the work setting. Claimant violated that expectation, among others.

I can well imagine a claimant coming before courts on an involuntary-quit situation because the employer failed to enforce rules relating to every day decency and civility in the treatment of situations like this one. It is important, too, to note that this has nothing to do with the fact that the foreman in this case was female. My views in this regard may be overly traditional, but I fail to see why respect for company rules and for our fellow human beings should not be enforced by holding persons accountable for their disrespectful conduct. I find those courses of action which promote the consideration of others in the conduct of human affairs justifiable, whether in employment or social situations, and whether they involve males or females. Actions such as the ones taken by the company in the instant case should be encouraged as promoting better and safer working conditions. Accordingly, I would uphold the hearing officer's decision denying claimant benefits.

SNELL, J., joins this dissent.